Glad to have you with us and glad to be back here in Richmond. Uh, we're happy to hear argument in our first case, uh, Williams v. Kincaid. Mr. Ulrich, whenever you're ready. Good morning and may it please the Court. I'm Joshua Ulrich here on behalf of Plaintiff Appellant Kesha Williams. Ms. Williams is a trans woman who has lived her life in conformance with her true gender identity for nearly 20 years. As a legal matter, she holds a Maryland driver's license that identifies her as a woman. She's received a legal name change and legal change to her gender markers. The Fairfax County Adult Detention Center, the jail, uh, the jail run by Defendant Appellant Kincaid classified Ms. Williams as a woman, assigned her women's garments, and placed Ms. Williams with the female population until Nurse Practitioner Wang changed that classification. While in custody, Ms. Williams faced mistreatment and discrimination from employees of the Sheriff's Office. She timely filed suit against, against those individuals and we worked collaboratively with Defendant Appellant's counsel to learn the names of those individuals that she had Rule 15 states that, uh, states that relation back applies if a complaint is served, quote, within the service period provided by Rule 4M. Ms. Williams met that requirement. Defendant Appellee's consented to and Judge Hilton ordered an extension of the 4M period and the, and the amended complaint was served within that extension. Counsel, can I ask, um, assuming hypothetically I agree with you that the service here was vacate and remand and let the district court consider all of these claims against, um, these two defendants in the first instance? Yes. Um, there are, there are two sets of issues here from, in that context. I think that, I think that Ms. Williams clearly pled a claim if you consider all of the allegations in the complaint as opposed to, uh, omitting the allegations between November 16th and February 12th. Uh, secondly, I believe that the ADA, um, the ADA issues, which I'll, which I'll come to in a bit, are, are different, are different qualitatively and that is something I think this court should look at regardless of the answer of relation back. Well, I thought the ADA claims were only pled against, um, Kincaid. Is that not right? That, that is correct. The ADA... Okay, so there's no, nobody is arguing that defending Kincaid is not properly in this case, right? Yes, that, that is correct, that is correct, Your Honor. I was just speaking to the two classes of claims. Um, even, even the... I'm sorry, I'm not sure I understand your answer to the question because I thought the question was if we find, hypothetically, if we conclude that you're right about this, we send everything back, but I, is that your answer? If you conclude that we're right about the relation back question, the gross negligence claims, uh, the deliberate indifference claim, and the equal protection claim should, should certainly be sent back. Um... Just the claims against... The claim... Officer Swang and against Mr. Officer Garcia go back. And the gross negligence claim against Sheriff Kincaid. Why does that... Why... Go back. Um... Allow me to back up. You, I, I believe you are, you are correct that the statute of limitations issue does not, does not address, uh, does, does not address the gross negligence claim against Sheriff, against Sheriff Kincaid. That is, uh, that would be correctly, uh, placed along with the AD, the ADA as something that's not related to the 15C issue. I apologize for that confusion. And related to that, aren't there even with, um, it seems to me there were dismissals of some of the claims against Garcia and Wayne purely on the statute period, but some were addressed that were within the statute period. Is there any reason we shouldn't address, um, claims that were, um, resolved by the court, um, on the reasons other than the statute? The only, the only concern that I have, um, with that is that the, the way that those claims were resolved in, involved omitting the earlier allegations. Sure, sure. Right. But with the exception of that, no, I don't disagree. But what about, um, I mean, I don't know how much we need to get into the weeds here, but it sure seemed, and I didn't understand this, as though with the claims against, um, Deputy Garcia, they all arise from the same search at the same time. I think it was January 2019, and on one of them, the district court said that's barred by the limitations period. So that we would have to send back. I think, I have, I think that was the equal protection claim. But then on gross negligence, for whatever reason, the district court appears to have reached the merits. So would we review that or should we still send it back? Um, I think you should still send it back, but I agree that it's a little bit unclear what the district court did there, because the district court said, um, this issue, I don't, that it doesn't need to reach the merits on that issue. But then discuss the, the merits, uh, in any case. I, I think as a, as a matter of pleading, it should, it should go back so that even if the district court lands in the same place, it has issued an order based on the full allegations. Thank you. Ms. Williams met all of the requirements for relation back under Rule 15, even if this court were to disregard the extension, the extension period though. Um, Nurse Practitioner Wang and Deputy Garcia, through their counsel, which is, uh, counsel shared by all defendants appellees. Counsel, I don't want to tell you how to argue your case, but as I understand it, the defendant agrees with you on, um, I don't, I don't see the defendant defending the district court's reasoning. The defendant has a different argument about the statute of limitations, which turns on John Doe and the stake, but I, I don't want to tell you how to argue your case, but I sure do want to make sure we have time to get to the ADA issue today. Absolutely. Um, very quickly with respect to the John Doe issue, um, I'll, I'll just say that I believe our argument is consistent with the Supreme Court's ruling in Krupski and this court's ruling, uh, in Goodman v. Praxair, where, uh, the Supreme Court shifted the focus of, of the mistake doctrine to, and the relation back doctrine to the knowledge of the, of the, of the defendants and not the knowledge of the plaintiff. Rule 15 speaks to notice and prejudice. Uh, there is no, there's no reason to believe that there were any notice issues or any prejudice issues in this case, uh, defendant appellees council, which you can share it by all defendant appellees were aware of the individuals we intended to name before the amended complaint was filed. And it's likely because of that, that the, that, uh, Garcia and Wang had actual notice as well. Uh, but I'll move on now to the ADA, uh, the Supreme Court ruled in Bostock that the language of statutes must be read as written, but considered in the context of the current day, while on the basis of sex was not necessarily written in the 1960s to part discrimination against trans individuals. Our modern understanding of those words necessitates that outcome. Similarly, we must apply a modern understanding of the text to the ADA, to the ADA. The exclusion of gender identity disorders means exactly what it says. It means that the ADA excludes certain disorders now rejected by the mental health community. Gender dysphoria is a new and different diagnosis, which rejects the idea that being trans is a disorder and acknowledges that trans people can experience certain symptoms and distress arising from having a gender expression that differs from their birth assigned sex. This court noted in grim V Gloucester County school board that being trans being transgender had been pathologized for many years. And the DSM four begins its definition of gender identity disorders with a strong and persistent cross gender identification. The DSM five shifts that focus. It is no longer a question that being trans is a disordered identity. It is that people who are trans can have symptoms arising from the distress of, uh, of having a gender identity that is different than their birth assigned sex. Counsel, if, um, uh, are you required to talk about, um, the dysphoria generally, or are you required to plead, um, the physical elements that were pathological elements with respect to your client? Ms. Williams pled, pled broadly with respect to including things like the WPATH standards. Um, but from a pleading perspective, certainly we, we can't plead just the existence of a, uh, of a condition. We have to plead specifically for our, for our client. But I believe that we did that here. Um, among other things, we pled that Ms. Williams has a gender dysphoria, that she's been long medicine for gender dysphoria in the form of hormone treatments, a daily pill, and a twice monthly objection for, uh, twice monthly injection, uh, for 15, for 15 years. So, and, and to the point you made just, um, earlier, uh, about how we look at the statute and the exception that we're dealing with, it, uh, I appreciate your argument in reference to Bostock about, uh, uh, a modern understanding. Um, would you agree that if we consider the, um, text of the statute at the time it was entered, the exclusion would apply? The text of the statute at the time. The understanding, the meaning of the words in the statute at the time it was enacted. I think the answer to that is yes, based on the, based on the, um, the, the case law at the time, uh, because among other things, one of the things that the exception in 12211B did was it took away the disability protections that trans individuals had, had for the previous 20 years prior to 1990 under the Rehabilitation Act. Uh, so at the time, I think, I think that that's the case. Last question I have on the ADA, and I'm sorry to ask so many, but, um, is it your contention that the, um, gender dysphoria your client experiences is a physical impairment? Yes, it, yes it is, Your Honor. Um, first, first of all, with respect to the question of impairment specifically, the Department of Justice filed a state, statement of interest, uh, in the Blatt case, and they, they explained that according to the case law and Department of Judge, uh, Department of Justice regulations, impairment just means a physical condition affecting one or more body systems, including the neurological and endocrine systems. Impairment is not a synonym for disability such that you have to plead disability to get to disability. Impairment is, is quite a low bar. And with respect to Ms. Williams, we pled that she was on hormone treatment. Hormone treatment is for the purpose of addressing a physical problem with the, with the endocrine, endocrine system. In addition to those things, the amicus brief filed by GLAD, um, speaks in depth on some of these issues, and I can refer, I can refer you there for some further. No, I just, I, I'm, I'm, I've read all that, and I just wanted to make sure I was understanding your claim that, that, that, that was, uh, impairment. I appreciate your answer. Um, absolutely. And to that point, even to the extent that the, that, um, the gender identity disorder exclusion, uh, is relevant here, which we don't believe that it is, it's a gender identity disorder exclusion except for, except for, um, disabilities arising from a physical impairment. And we believe that the, that the science, as it's evolved in the past 30 years, and as the GLAD brief speaks to, um, shows that being, being trans is the result of a physical impairment. It's the result of having, uh, sex hormones that are incongruous with your, with an individual's gender expression. Counsel, it seems like the, um, the, the, so as I understand it, you're making two alternative arguments. The first one is gender, um, dysphoria simply is not a gender identity disorder as used in the statute. We're not, we're not under this exclusion at all, but alternatively, if we are, it's the result of a physical impairment. So you're within the, as people have called it, a safe harbor. It looks to me like the courts adopting that second position are saying, like, eh, it is a plausible argument that there is a physical impairment here. We'll let this get past 12 v. 6 and then you'll have to prove it up on summary judgment, probably with experts. Is that, is that, if we were to rule in your favor on that ground, is that roughly what we would be saying? You get past 12 v. 6 and then we'll see what happens on summary judgment? That is certainly one option, Your Honor. That's the only thing you get here, isn't it? Well, um, the, the court in Doe v., um, Triangle Donuts, for example, went, went with that, went with that option to say the pleadings are too early to address this, this question and a plausible reading allows. Um, but the, the other issue, or the other possibility is to settle this issue, not exactly through a constitutional argument, but through an argument related to constitutional avoidance. I thought your constitutional avoidance argument went to your first argument. This just is not within the, I don't see us figuring out. Whether or not this particular condition has a, um, results from a physical impairment or not. Something on which even DSM-5 says there are early, there are indications that that is the case, but they're not prepared to say it's the case. I don't see how we reach a scientific conclusion on that without any expert testimony as a matter of constitutional avoidance. Um, with, with respect to reaching any sort of scientific answer, I completely agree with you, agree with you, your honor. Um, with respect to the question of, of constitutional avoidance, um, I, I think that this court can reach that if for no other reason than the, um, uh, than the categorical way that this exclusion only applies to people who are, who are trans. Can I, on, on that question, I'm not sure I understood your answer to Judge Quattlebaum. I thought your argument was what this statute meant when it was passed, reading the words as they were intended to be read at the time. What this meant was, um, it covered a diagnosis that turned on being transgender itself being a mental disorder. And that is simply not a disorder or that is not a disorder that your client has. Your client doesn't have that. She has something very different. So even understanding the words as they were intended to be used and read at the time, these are, there's just a mismatch here. These are different diagnoses and gender dysphoria simply does not fall within the meaning of a gender identity disorder. But I think you said something different to Judge Quattlebaum and I want to make sure I understand what your argument is. Sure. First of all, I believe that is an, is an accurate representation of the argument. I believe the answer that I was providing to, to Judge Quattlebaum was specifically speaking to the intent to the words as they were drafted in the, in 1990s specifically and the case and the case law surrounding it. I don't believe that there has ever been a point when this law was, when this law was appropriate or for that matter constitutional. But it, at the time it did match what was in then the DSM-III and later the DSM-IV. And it was, it was consistent with, with that language. Now that gender dysphoria is the, is the, is the appropriate diagnosis. It no longer matches that language. So I'm, I'm still not clear. I think I'm a little thick here this morning. So your answer is that at the time that the legislation was written, it, it didn't allow a person who has a disorder that your, your client does not have to prevail. That is correct. That, that said, the disorder that my client now has didn't, did not exist at least diagnostically at the time. Okay. And that. Can I say, does your argument depend on the idea, so, and the amici briefs in this case have been extremely helpful. I thoroughly understand that gender identity disorder as defined by DSM-III is a different diagnosis than gender dysphoria under DSM-V, but does your argument depend on the idea that when Congress passed this exclusion in 1990, it was incorporating the DSM-III meaning of gender identity disorder? No, I don't. I don't believe, I don't believe that it does. That. There are sites in your brief saying, well, what was it doing then? Yeah. Well, part, part of, part of the issue is that as we look back over this, it is not entirely clear what, what Congress exactly meant at the time. I don't think that that is, that that is completely relevant here now that again, this is the, that disorder is not a disorder that we've pledged that our client has. But gender identity disorders in the, in the plural, and then, but for physical impairment, the, you know, the amic, the amici is the, in their briefs and in our discussions with, with them and in our research on the issue, it's honestly not entirely clear what the, what the legislators met, meant at the time, except that, you know, there is substantial evidence in the legislative record that these 13 or so exclusions were bundled together because there were, there were a group of senators who felt that these things essentially for moral reasons should, should be excluded. And you know, that's one, that's one of the reasons that we think even if, even if this court were to look at the issue from a constitutional perspective, and even if the court were to apply rational basis review, the legislative record seems to make clear that there was never a rational basis. It was purely animus. All right. Do you have anything? You're, you're well over time. Is there anything that you need to tell us? No, Your Honor. Are you sure? Questions? All right. Well, you have, we'll still give you some time for rebuttal. We'll give the other side just as much time here. Thank you. Good morning, may it please the court. My name is Phillip Crone. I'm here today on behalf of the appellees in this matter, Stacey A. Kincaid, Nurse Xin Wang, and Deputy Garcia. Based on the amount of issues in this, our time will be tight, but I do want to set forth briefly the issues that I'm going to talk about. Again, Ms. Williams is a transgender woman. She was incarcerated in the Fairfax County Adult Detention Center from November to September 16th, 2018 until May 20th, 2019, approximately a six-month period. As a result of that, she brought numerous claims against the appellees and what we're going to be addressing today that are still before the court. First, I want to address the ADA claim against Sheriff Kincaid. Second, I want to go into the 1983 claims, the deliberate indifference claim against Nurse Wang, and the equal protection claim against Deputy Garcia. In discussing those, I'll also address the Rule 15 Relation Back issue. Then finally, time permitting, though it's thoroughly briefed on both sides, the issues of gross negligence. Counsel, I'm, as Judge Harris said earlier, you argue have or you won't, but, you know, the equal protection and the deliberate indifference claims were dismissed as I read them completely on statute of limitations. So, yeah, depending on what you think about that, I mean, there may be less we can do with those than others. So, I just offer you that, but you argue whatever you want. Well, depending on time, this is being reviewed de novo and the court does have the ability to affirm or based on anything that is before it in the record. I got you. The ADA discussed qualified individual with a disability. It's a gate. That is the starting point. It's the threshold. There's no argument here whether or not gender dysphoria and specifically Miss Williams' gender dysphoria is a disability. It all comes down to 42 U.S.C. 12211, the exclusion statute. Gender identity disorder. That's the word that's used. It's not mentioned as being the diagnosis from the DSM. As alleged, gender dysphoria presents as discomfort or distress that is caused by a discrepancy between a person's gender identity and that person's sex assigned at birth. So, gender dysphoria is a condition involving gender identity, plain language of the statute. It's a gender identity disorder. The next issue then is whether or not it is resulting from a physical impairment, not whether it is a physical impairment. Before we get to the physical impairment, I mean, I think there are some pretty good indications that when Congress included gender identity disorders, it did mean the currently understood disorder in which being transgender is itself a mental disease. And Miss Williams is saying, I'm not pleading that. My gender identity is not, in fact, a disorder. I am pleading something different. I'm pleading the clinical level of stress that is associated with this disjunction between my sex assigned birth and my gender identity, and that is different, and it is not what was a term of art, gender identity disorder. There are district courts that have accepted that reasoning. Why is that wrong? Those district courts, specifically the Blatt case out of the Eastern District of Pennsylvania and also the Doe versus Massachusetts Department of Corrections out of Massachusetts, both of those cases in their reasoning accept that gender dysphoria falls under gender identity disorders. They do so in it. They shift, and their analysis goes into whether or not, specifically the Eastern District of Pennsylvania shifts and says, well, maybe... Maybe just tell me why what I said is wrong, because we may read those district court decisions differently. So why is that not right? That's their argument. I just want to give you a chance to respond to it. The statute reads gender identity disorders. There's no reference to it being a specific diagnosis. If you take a doctor's diagnosis or whether it's based on the DSM or not, if it's a condition, a disorder, an impairment that involves gender identity, then it falls within that plain language of the statute. It can stop there. Then you're moving on to whether or not it results from a physical impairment. So it just reads the statute as though what it says is disorders involving gender identity? Yes. Okay. It's not what it says, but okay. Well, I'm not quite... The argument of the other side is that gender identity disorder is something very different from what they have pled. You just say no, and we win. I mean... They're using the reasoning from those other district court cases, being that it shifts. The gender dysphoria was a new diagnosis, so it shifted it. In that line of reasoning, if the court is looking at the DSM, which is relied on by those, the American Psychiatric Association changed the name based on the fact that they wanted to eliminate any bad connotations with it. They even say they wanted to make available legal resources and not... I feel sorry for these people. Is that right? And therefore, according to you, that's why they changed... But that's not... They're two different things. At least the disease that she is pleading, the disability that she is pleading, by definition causes this physical symptoms. And gender dysfunction, or whatever the earlier thing was, did not. Right? The change in it focused on symptoms. Yeah, the new diagnosis focused on symptoms. Go ahead. It wasn't just a relabeling. I think they didn't just change the name so people wouldn't feel bad. It was an entirely new understanding that being transgender itself was not a disorder. Your gender identity is not a disorder. Gender identity disorder. They rejected that and they said gender identity is not, in fact, a disorder. Sometimes there are clinical levels of stress that follow from a disjunction between sex assigned at birth and gender identity. But that is an entirely different thing. I cannot convey to you how meaningful that change is. That is not a new label. It is a whole new way of understanding what is going on here. Using that argument out of the black court, they refer to that first section in the exclusion as non-disabling and the second as disabling. It's an exclusion. I'm not suggesting that we write down what the black court said. So I really want to, again, use your time however you want, but we're not reviewing that decision. So in the exclusion, you already have to meet the threshold of disability. So people who have gender identity incongruence or anything that doesn't rise to the level of being a disorder or condition that's a disability, it's not applicable ever. It doesn't fall into the ADA yet. So changing the symptoms to focus on what makes it a disability doesn't change that there's still an exclusion for it. The definition is what describes how it affects the major activity that substantially impacts the major activities of life. It doesn't necessarily, for example, if you buy a ticket to an amusement park, you got to run through the gateway. That's, you're in. You have your child with you, she goes to hand her ticket up to ride a ride, and the attendee says, sorry, you're not tall enough. The argument on the other side is, well, I already have my ticket, so I get to ride it. The height, it's an exclusion. The statute here is an exclusion. There's no disagreement that the symptoms aren't disabling or that even they changed. Plain language, gender identity disorders. Within the definitions, you can see that there is disorder, there's incongruence, and it's involving gender identity. The analysis can stop there in the plain meaning. The allegations in this case don't reference anything about resulting from a physical impairment. There's nothing in it that suggests that gender dysphoria always results from a physical impairment. They're insufficient. The ADA claim based on that can be dismissed. Can I ask you a question about that, about the physical impairment? So you are not arguing, as I understand it, that there is not a plausible case to be made that this condition arises from a physical impairment. You're just saying she didn't plead that. Correct, in which case, in the other cases where it's been allowed to go on, they claim Again, the allegations made that claim. Not all of them, but many of them. So can I just ask you a question? If this whole ADA claim, in your view, turns on the fact that instead of writing, I have gender dysphoria, she needed to write, I have gender dysphoria, which results from a physical impairment. Why did the district court dismiss this with prejudice? I guess by default, because he didn't say it was without prejudice. Why not let her amend her complaint? I mean, that seems, I know this, we just reviewed this for abuse of discretion, but I don't understand. That would just be such a formality. Why would you possibly? Is it your understanding that the district court intended to dismiss this with prejudice? Because he just didn't say one way or the other. It didn't say. Under my argument, if plaintiff has the basis to make that claim, then they would be able to, they would be able to re-plead. Because it's not that gender dysphoria is always excluded. It's not, based on the language of the statute. If she could plead that it was the result from a physical impairment, then I think it, as was discussed earlier, it can get beyond the pleading stage. And then it could still be issue for proof. Right, but if she had pled that, it would be, it would escape a 12B6 motion. Is that what you say? Yes, and if there was a basis to have pled that. Well, when you plead things, I don't know that that's true. By summary judgment, yes. Turning to the statute of limitations in relation back. The Rule 15 is clear. It says under C that the amended changes the party or the naming of the party against whom a claim is asserted, if Rule 15C1B is satisfied, and if within the period provided by 4M for serving the summons and the complaint, the party to be brought in by the amendment, receive such notice of the action that it would not be prejudiced in defending on the merits and knew or should have known that the action would have been brought against it but for a mistake concerning the proper party's identity. The keystone here is the but for the mistake. Well, counsel, I don't think it is because you didn't, not only did you not make that argument in front of the district court, but you actually argued the opposite. What you told the district court was that the relation back doctrine applies to renaming John Doe's and amended complaints when the John Doe defendant receives notice and you cited Rumble, the sort of leading district court case by Judge Ellis. Yes. Resolving that issue against the position you're taking today. So I think it's not just that you forfeited this argument. I think if there's any error here, it's invited. So I don't see why we can reach that question now. Understood. As it moves forward beyond the claims, the court only dismissed for Nurse Wong, dismissed the claims that occurred prior to February 12th based on the statute of limitations. The court also dismissed the deliberate difference claims beyond that, that were still. Those involved missed hormone treatments prior to prior to Miss Williams release. So you're saying the district court dismissed the equal protection and deliberate indifference claims for reasons other than statute of limitations? Some of them. Not for Deputy Garcia. Deputy Garcia, the alleged incident occurred within the period that we were arguing was beyond statute of limitations. As for Nurse Wong, there were two sets of allegations. There was the initial hormone treatments and then there were also the furnishings of underwear. And then there's the treatments at the end of her stay in April and May. I don't think you've answered the question yet, though. Some of those are. Yes. So I apologize. The court dismissed on the statute of limitations, but also dismissed on the pleadings for Nurse Wong that happened after. I mean, isn't it important in a deliberate indifference claim that you want to have the full scope of the conduct in front of you? I mean, does it make sense to, if we think, assuming hypothetically, we think the district court was wrong in applying the statute of limitations, don't you want to send the entire, it's one deliberate indifference claim? And doesn't the district court have to view all of the relevant conduct in deciding the claim? Based on the pleadings, there is a separation. The pleadings allege that there were multiple treating providers. And as it comes to the treatment in April and May of the missed hormones, the allegations indicate that there were, it wasn't just Nurse Wong involved in the treatment. There are no allegations that the mistreatments at that time resulted in any substantial harm, that there was a delay. Ultimately, there are mistreatments, and then she's released. There's no allegations that there would have been notice to anyone during that time where it could have resulted in rising to the level of deliberate indifference. Well, hypothetically, if you had a case in which all of it was discovered together, was considered together, rather than just the end things, which you say were, don't evidence deliberate indifference, wouldn't that assist your general deliberate indifference case? It could, but if we're . . . It's not, it isn't a single incidence, and it wasn't argued in the district court that it was a single incidence. They were divided into separate outcomes. There was a delay, treatment started, treatment was uninterrupted, then there were other issues. The argument that it was a continuing violation also wasn't raised in . . . Let me give you a hypothetical. Suppose that somebody is in prison, and you don't give them any food for two days. That's deliberate indifference, the prison maker. Then two weeks, three weeks later, you decide that you're just going to give them very minimal food. Then three weeks after that, you give them two meals a day. Do you not think that all of that would come together and have bearing on the question of whether there was deliberate indifference? No. Those would be argued. Okay. In the particular scenario, it could be relevant because it's all dealing with food. We're trying to find out whether the actions were deliberate, whether this person was deliberately indifferent to someone else. If the answer is no, that's fine. You can go on. I don't want to stop your argument. Can I ask you about Deputy Garcia and the search? The district court, again, I asked our colleague about this too.  I think it's the equal protection claim. The whole thing is time barred. Then on gross negligence, appears to go on at least, I'm not sure, to reach the merits and say that there can't be gross negligence because he conducted the search pursuant to this policy. There's some care. As I understand the allegation and the complaint, the allegation is that the search was in violation of policy, which would have allowed for it to occur. It is alleged that Deputy Garcia was not uncertain and knew that Ms. Williams was a woman. What is going on there? Let me give you a chance to . . . Did the district court reach the merits? If it did, what was it doing here? The district court definitely dismissed based on the statute of limitations. However, the opinion does go on to address the merits not for the equal protection, but it does do it for the gross negligence claim. In doing so, applied the Virginia standard when it comes to gross negligence, which requires a complete, complete lack of any actions. If we consider it, and that's a question given the statute of limitations on the other. I understand the argument that Virginia law requires a complete lack of care, but if the basis of the dismissal was that Garcia was following policy and that indicates some care and the allegations are the opposite of that, that Garcia was not following policy but was acting in conflict with it. I don't understand how that can be evidence of some care when the allegations, I'm not saying they're true, are that they were acting contrary to the policy. My time is up, but may I answer that question? Yes. You can take some, yes. Thank you. The allegations related to the policies also provide an area where she's housed with the men, so she has to be searched with the men. Then there's the other policy of, unless there's a question. Here. What words you use to address Ms. Williams? The allegations about using Mr. and Sir, those were part of the allegations too, correct? Those are part of the allegations. I read those to be more towards the equal protection. Perhaps. Opposed to the gross negligence, but the gross negligence claim here isn't just a search with someone coming in where there would be a question of what was happening. Here as pled in paragraph 90, it was a shakedown. During shakedowns, officers are looking for contraband. They're catching inmates off guard. Taking the time to not do that efficiently, requiring she be taken away, escorted out, have a different person search her, it would go against the circumstances of doing a security shakedown. Based on that, there's care in following the policy. There's a mail guard. The mail guard searched her because she was housed with the men. There's some sort of care. In the contradictory, the complaint alleges that the injuries or damages from Ms. Williams' stay arise from the fact that she was housed improperly. That question is not before the court and it wasn't before the district court. That there was a policy that in that policy was improper and she should have been housed differently. Based on that allegation, the reading again goes with that Deputy Garcia engaged in some sort of care. He's following rules. There's somebody housed in the mail unit. They're doing a shakedown. He searched them. Okay. When you talk about following the rules, they have to follow the federal regulations too, right? Those are the rules. Okay. Well, they plead that under the federal regulations, cross-gender pat-down search should not occur unless there is an emergency. 28 CFR 115, 1115. What about that? Not following a federal rule under Virginia law doesn't amount to a complete neglect. I thought you just told me that following the rules showed that you acted properly. Now you're telling me that not following the rules. Because in here, I mentioned one rule and now there's another rule on there. If he didn't follow, if there are five rules and he didn't follow any of them, now we might be getting into a scenario where there has been a complete neglect. Well, but the rule that you're holding up is contrary to federal law. Which isn't at issue right now. I beg your pardon? None of the policies of the jail are being challenged. Well, but they're being used as a defense. So they are being, they are challenging your use of them as a defense. Right? They are. And again, in doing so, under the circumstances of a shakedown, it can't be said that W. Garcia didn't do anything. The bar in Virginia is high. The Elliott v. Carter case, which sets it, aren't good facts. In that case, you had a troop master giving swim lessons to kids. And then knowing those kids can't swim brings them out into the water, multiple children. And then kids end up getting caught in the water. They can't get back. He creates enough distance where it becomes hard for him to save. But he made an attempt to save. And that's all it took. He, standing somewhat near the children he knew couldn't swim, that he allowed to go out under his supervision. The bar is high. Here, the allegations don't remove all that is leaving it that it's plausible. There is complete disregard that nothing was done on behalf of Deputy Garcia. As I'm beyond my time, are there any further questions from the Court? All right. Thank you very much. Thank you. You reserve five minutes for rebuttal. And I'm going to hold you to the five minutes. Absolutely, Your Honor. Honestly, I only want to mention a handful of things. Judge Harris, I'm happy that you mentioned the question of amendment. If this was simply a pleading issue, if it was simply an issue of pleading physical impairment, Judge Hilton should have granted us leave to amend to fix a facial problem with the complaint. Did you ask to amend? Pardon me, Judge Harris? Did you ask to amend? We did not ask to amend, no. But Judge Hilton's ruling on this amended complaint, the only change between the original complaint and the amended complaint was to replace the John Does. So this was the first ruling substantively on the complaint. And as the Court noted, Judge Hilton does not say specifically with prejudice or without prejudice, but in litigating a lot of cases in front of Judge Hilton, my experience is that if he wants to give you leave to amend, he says out loud that you're being granted leave to amend. I also wanted to return to the question of pleading physical impairment. One, again, we could have added that, although I added that more clearly, but I do think we did plead physical impairment insofar as we pled that Ms. Williams was on hormone therapy, which is to address the for her gender dysphoria. So am I understanding right? I mean, are you taking the position that it wasn't actually necessary to plead physical impairment because like we pled the disorder and the disorder does in fact result from a physical impairment. So once we pled the disorder, everybody knows that there's a physical impairment at root or are you taking the position that you did need to plead it and you did and or if you didn't, you should have been allowed to amend. We are absolutely taking the first of those positions, Your Honor. That said, even if the court found that physical impairment was necessary, I also believe that we pled that. Mr. Crone mentioned that the policies were not being challenged here, and I don't think he's technically incorrect about that. But in the pleadings, the policies are used to show gross negligence and I believe deliberate indifference as well. On that point, I thought you were very much the policies were part of your arguments that the housing decision based solely on the absence of genitalia surgery. I thought you were challenging that directly, at least as to Kincaid. Yes. I thought that too. We absolutely believe that those policies are improper. Did you plead it? What we pled is that those policies go to Sheriff Kincaid's gross negligence. That those policies that are inconsistent with the PREA regulations speak to her grossly negligent behavior. All right. I don't think it's accurate to say that we pled a facial challenge to the policies as much as we pled that these violative policies of the federal Do we have any questions? The last thing that I want to add is just that, and I think the court noted, but Defendant Appellee is largely sort of a hand wave away the weight of precedent on this issue from the district court. They simply say that Doe and Blatt were wrongly decided and therefore everything that came after was wrongly decided. But I think that's an inconsistent and inaccurate view of the way that the system works. Doe and Blatt were decided and then 10 other competent courts looked at those decisions and decided they were correct. That's how we create a weight of authority. And I don't think we can just disregard all of those opinions because they think they're progeny of something that was wrongly decided. And unless you have any further questions, I will stop as instructed by Judge Botts. Thank you very much for your arguments. You know, usually we come down and greet counsel after argument. We're not going to be able to do that today, but we hope the next time that you're here in the Fourth Circuit, we will be able to do it. We appreciate your arguments. Thank you very much.
judges: Diana Gribbon Motz, Pamela A. Harris, A. Marvin Quattlebaum Jr.